Jason R. Naess, ISBN 8407
Assistant United States Trustee
Brett R. Cahoon, ISBN 8607
Andrew S. Jorgensen, ISBN 8695
United States Department of Justice
Office of the United States Trustee
550 W. Fort Street, Ste., 698
Boise, Idaho 83724
(208) 334-1300
(208) 334-9756 [Facsimile]
ustp.region18.bs.ecf@usdoj.gov

Attorneys for the Acting United States Trustee

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| **In re:** | |
| JASON ROOP, | Case No. 21-20286-NGH  (Ch. 7) |
| Debtor. | |

## UNITED STATES TRUSTEE'S MOTION TO CANCEL FEE AGREEMENTS AND FOR MONETARY REMEDIES

The Acting United States Trustee ("UST") hereby moves the Court to void the fee agreement(s) between Debtor Jason Roop ("Roop") and his former counsel, Kameron Youngblood ("Youngblood"), and to impose monetary remedies against Youngblood, including the return of any fees collected from Roop that are beyond whatever value Youngblood demonstrates was reasonable for his provided services, due to lack of compliance with §§ 329, 526, the Bankruptcy Rules of Federal Procedure ("Bankruptcy Rules"), Local Bankruptcy Rules ("LBR"), and Idaho Rules of Professional Conduct ("IRPC").  Pursuant to Local Bankr. R. 9014.1, the UST intend to call witnesses and present evidence at a hearing on this Motion.

### I.      BACKGROUND

1.      Roop, believing he needed to file for bankruptcy protection, searched for

**Motion - 1**

bankruptcy counsel in or around late-June 2021 using Google. Youngblood was one of the top search engine results, and appeared to have some good online reviews, so Roop sent him an email seeking assistance.

2.      Roop lives in Sagle, Idaho, roughly 45-minutes north of Coeur d'Alene by car. Youngblood's office was in Idaho Falls, Idaho, nearly 8-hours from Roop's residence by car.

3.      Soon after Roop sent Youngblood his initial email, Youngblood called to discuss Roop's situation. Youngblood briefly explained the different chapters of bankruptcy and asked superficial questions about Roop's income, expenses, debts, and assets. At the end of the roughly 25- to 30-minute conversation, Youngblood recommended a Chapter 7 bankruptcy filing and told Roop he would be able to file a petition within a couple of days.

4.      After the initial phone call, Youngblood sent Roop a text on June 23. In the text, he explained he would need the following to file a bankruptcy on Roop's behalf: (1) pay stubs for two months; (2) bank statements for two months; (3) Roop's 2020 tax return; and (4) a list of creditors Roop thought he owed. Youngblood indicated he did not need creditors' addresses, account numbers, or the amounts owed if that information was not readily available to Roop.

5.      In another June 23 text, Youngblood told Roop his email was youngbloodlaw@gmail.com.

6.      Roop texted back to clarify whether he needed to provide his wife's pay stubs, and Youngblood indicated that, while he would need a general idea of her monthly income, he did not need pay stubs.

7.      Roop sent Youngblood a text later that night, on June 23, indicating he had decided to file for bankruptcy. The next morning, Roop sent Youngblood an email, trying to provide the requested documentation.

**Motion - 2**

8.      Roop and Youngblood texted back and forth on June 24, scheduling a follow-up phone call for Saturday, June 26.  During the text exchange, Youngblood indicated the requested documents did not arrive over email and stated Roop could send the documents via text.  Roop promptly texted five documents to Youngblood, two pay stubs, two bank statements, and his 2020 tax return, and gave Youngblood a rough estimate of his wife's monthly income.  Roop did not text Youngblood a list of his creditors.

9.      Also on June 24, via text, Youngblood informed Roop he would need to take an online consumer credit counseling course before his case could be filed.  He provided Roop with information to login to a course and stated:

> It's not a pass/fail type of course and my billing code is on there.
> You can literally make up answers.  You have to spend a whole
> hour on it but if you aren't done in 20 minutes you are
> overthink it!  Don't overthink it.  At the end of the hour you can
> submit the course and you have to internet chat with a counselor
> the chat part takes like five minutes.  If you have questions call me.

10.      Once Roop finished the counseling session, Youngblood texted him, indicating that, with the scheduled phone call on Saturday, he should be able to file Roop's case for him on Sunday, June 27.

11.      Youngblood called Roop on June 26, as planned.  The phone call lasted somewhere between 30- and 45-minutes.  During the phone call, Youngblood asked Roop questions about household items, recent transfers, purchases, his marital status, and other information that would presumably be needed to fill out the Bankruptcy Schedules and Statement of Financial Affairs.  To Roop, it seemed as though Youngblood was asking questions from a list and was seeking specific information.

12.      While Youngblood asked Roop to verbally name as many creditors as possible, he never sought copies of bills or credit card statements from Roop.  Rather, Youngblood told Roop

his office could look up the amount Roop owed creditors and fill in that information.

13.     At the conclusion of the June 26 phone call, Youngblood restated he would file Roop's bankruptcy the following day, by the end of Sunday June 27.

14.     On June 27, Roop followed up with a text: "Did everything go ok?"  Youngblood responded by text: "Yes everything is good I'm just sitting down to do some work now."

15.     Roop texted again on June 28, asking if his case got filed.

16.     Youngblood did not respond on June 28 but sent Roop an email on June 29, with signature pages for Roop to sign.  Youngblood did not provide Roop a copy of the documents to which the signature pages related.

17.     On June 30, Youngblood texted that he would call Roop in a few hours and needed Roop to return some signature pages before he could file the case.

18.     Roop's recollection of the referenced phone call is that Youngblood verbally described the assets included in the bankruptcy Schedules but did not review the scheduled debts.  Roop did not have a copy of the Schedules to review as Youngblood verbally described them over the phone.

19.     Roop thought he signed the required paperwork, and, on June 30, texted Youngblood: "I signed the paper for you."  Roop followed up the next morning, July 1, asking Youngblood whether everything was OK.  Youngblood responded that same morning that he was "getting ready to file yours [Roop's case] now."

20.     Roop followed up on the afternoon of July 1, asking whether everything had gone well with the filing.  Youngblood called Roop sometime after receiving the July 1 text, indicating additional signature pages were needed.

21.     The next morning, July 2, Roop sent Youngblood an email with signed signature

**Motion - 4**

pages attached, followed immediately by a text: "Is that all of them?"  One of the pages had not been signed, Youngblood pointed out the unsigned page via text, and Roop promptly signed the page, sent the documents back, and followed up with a text: "Are we good?"

22.     Youngblood indicated there was one more page he needed signed, the disclosure of compensation.  He texted Roop that he was sending him the disclosure of compensation and that, otherwise, everything was taken care of.  Youngblood ended up sending Roop two documents for signature, his 2016(b) Disclosure of Compensation and the Certification of Notice to Consumer Debtor(s) Under § 342(b) of the Bankruptcy Code.  Roop signed and returned the pages on the morning of July 2, then immediately texted Youngblood he had done so.

23.     Youngblood never requested original copies of any of the signature pages referenced in this Motion.  In fact, none of the signatures were signed with pen and paper.  Rather, all were electronic signatures signed by Roop on his phone.

24.     When it appeared all required signature pages had been signed and returned, Roop asked whether creditor's automatic payments from his bank account were going to stop, or whether he needed to call the creditors.  Youngblood responded on the afternoon of July 2:

> . . . I will send you, your case number date and time we go to court
> etc here in about a hour or so (sic)
>
> ****
> And no when I send you your case numbee (sic) call them tell
> them you filed bankruptcy here is your case number and to stop
> payments and make sure your bank knows which payments you
> want to stop.

In other words, on July 2, Roop had emphasized, and Youngblood seemed to understand, that getting a case filed was important to Roop to stop creditors' automatic withdrawals from his bank account, and Youngblood told Roop he would have a case number later that afternoon, which Youngblood explained was the key to preventing further withdrawals.

**Motion -  5**

25.     Youngblood did not provide the promised case number on July 2, because he did not file Roop's bankruptcy that day.  He also did not inform Roop that he had not filed the case, and Roop followed up with texts later that day, and again on July 5, asking whether Youngblood had a case number for him.  Those texts went unanswered.

26.     Onemain Financial, one of Roop's creditors, automatically withdrew $188.25 from Roop's bank account on July 2.

27.     On July 7, 2021, Youngblood sent Roop an email indicating: "We are filing your case today and I will get your notice of filing to you before I leave today."

28.     On the morning of July 8, not having received a notice of filing, Roop responded via email, asking whether there were any updates on getting a case number and court date. Youngblood did not respond and Roop followed up with texts during the afternoon of July 8: "Hey any word on the case?" early in the afternoon; and, when that did not prompt a response, "Sorry I don't mean to bug you just trying to get this figured out" and "Thank you for your service" after the end of the workday.

29.     On July 9, Jora Credit, another of Roop's creditors, withdrew $216.42 from Roop's bank account.

30.     With still no response from Youngblood, Roop sent Youngblood a text on July 9, imploring: "Please get back to me I can't afford them taking more money."

31.     Cash Net, USA, another creditor, withdrew $259.05 from Roop's bank account on July 12.

32.     Youngblood still had not responded by July 15, prompting additional texts from Roop: "Please get back to me" and "Why are you ignoring me."

33.     During the early morning of July 16, despite having received signed signature

pages from Roop on July 2, Youngblood sent Roop an email with blank signature pages, directing him to sign where circled and then to email the signed signature pages back to Youngblood.  Youngblood's email also inquired about Roop's wife's monthly income and how long they had been married – information Roop had previously provided to Youngblood in June. Youngblood immediately followed the July 16 email with a text: "Look in your email."

34.    Roop signed and returned the signature pages within minutes and Youngblood confirmed over text that all signature pages had been returned.  Roop then texted Youngblood the information about his wife's income and his marriage date.

35.    Youngblood followed with a text:

> I will text you here shortly in about 20/30 minutes with a case number; but I'm also going to send you an email with court information and notice of filing; then I'm going to send you a docusign post petition agreement from fresh start funding that you can sign on your phone; then I'm going to send you 4 other documents that I will circle where you will sign and send those back to me.

36.    Youngblood filed the petition soon thereafter and sent Roop an email with a Notice of Bankruptcy Case Filing attached.

37.    In the meantime, three creditors had taken additional withdrawals from Roop's bank account on July 16: Rise Credit withdrew $183.28; Jora Credit withdrew $216.42; and Reliable Credit withdrew $275.46.  The July 16 withdrawals resulted in Roop's bank assessing $65.00 in overdraft fees.

38.    The signature pages filed by Youngblood with the Petition are dated June 29, 2021.  *See* Dkt. No. 8.  Because the signature pages signed by Roop on July 2 and July 16 were both dated June 29, it is unknown whether the pages filed by Youngblood are the pages he received on July 2 or the pages received July 16.

39.    In Youngblood's July 16, post-filing email to Roop (the "Next Steps Email"),
Youngblood provided Roop information about a number of "next steps" in the bankruptcy.
Among that information was:

> Now that we have filed your case you will get notices from the
> court.  One of those is the Deficiency Document Notice.  You have
> 14 days from the date we filed this Bankruptcy to file the second
> set of Bankruptcy Documents.  The Court will send that letter to
> you directly.  We will meet by telephone before that time and
> review and file the deficiency documents.  We may need more
> documents and information from you.  If we ask you for more
> information, it is so that we can provide it to the Court on your
> behalf.

40.    Surprisingly, given the language of the Next Steps Email, Youngblood provided
Roop with signature pages for the Chapter 7 Statement of Your Current Monthly Income (Form
122A-1); Schedules; Statement of Financial Affairs; and Statement of Intention (in other words,
the signature pages for the deficiency documents) later in the morning of July 16.  Roop signed
those signature pages on July 16 and returned them to Youngblood on July 17.

41.    Also on the morning of July 16, Youngblood requested Roop to sign a post-
petition fee agreement, and indicated he needed the agreement "back before 11."  Roop promptly
signed the document on his phone via DocuSign, and let Youngblood know he had done so.

42.    On July 16, Roop also inquired via text whether he could "turn over the two cars
with a loan on them."  Youngblood responded Roop could turn them over to his creditors any
time he wanted, but that he should keep the vehicles insured until he turned them over.

43.    When Youngblood filed Roop's petition on July 16, the docket entries and the
Notice of Bankruptcy Case Filing included the name "Jason Roop;" the petition and other filed
documents, however, were for "James Roop."  *See, e.g.,* Dkt. No. 1.  As a result, the Notice of
Chapter 7 Bankruptcy Case that was sent to all creditors and parties in interest included the name

"James Roop."  Dkt. No. 3-2.

44.    Among the documents Youngblood filed on July 16 was his Disclosure of Compensation.  Dkt. No. 5.  Among other things, the Disclosure of Compensation provides that, in exchange for the post-petition compensation Roop was to pay him, Youngblood agreed "to render legal service for all aspects of the bankruptcy case."  *Id.*  While the Disclosure identified a few, specific tasks that were not included in exchange for the disclosed fee, none of the excluded tasks related to filing required documents needed for Roop to obtain his discharge and close his case.  *See id.*

45.    Within a week of the filing the bankruptcy petition, Roop turned a Chevy Impala over to the secured creditor that had provide Roop the loan for the vehicle.  The Impala was one of the two vehicles referenced by Roop in his July 16 texts with Youngblood.

46.    The Court set a July 30, 2021, deficiency deadline for Roop's Form 122A-1, Schedules, Statement of Financial Affairs, and Statement of Intent.  *See* Dkt. No. 12.

47.    On July 22, Roop informed Youngblood the name on the bankruptcy documents was incorrect.  He texted: "The paperwork that was sent to me says James not Jason."  Youngblood did not respond.

48.    July 30, 2021, came and went without any deficient documents being filed and without a motion to extend the deadline for filing the deficient documents even though Roop had returned the signed signature pages for all deficient documents back on July 17.

49.    On August 16, two days before the scheduled § 341 meeting of creditors, Youngblood filed the deficient documents.  *See* Dkt. Nos. 15, 16.  He also filed signature pages for the deficient documents.  Dkt. No. 17.  The signature pages were those signed by Roop back on July 16.  *Id.*  There is no explanation as to why Youngblood delayed a month after receiving

the signature pages, and several weeks past the deficiency deadline, to file documents he had in

hand on July 17.  Youngblood's approach provided the Chapter 7 trustee only two days to review

documents that, apparently, could have been filed over a month prior to the meeting of creditors.

50.    Despite the language in the Next Steps Email indicating Youngblood would call

Roop and discuss the deficient documents prior to their filing, Youngblood never reached out to

discuss or review the documents before he filed them.

51.    Among the late-filed deficient documents was a Statement of Intent that indicates

Roop's intent with regard to the two cars with loans against them was to "Retain and pay

pursuant to contract" for both vehicles.  Dkt. No. 15.  Even though Roop had asked on July 16

about when he could surrender the vehicles to his creditors, Youngblood had advised Roop that

same day he could surrender the vehicles at any time, and Roop had returned one of the vehicles

weeks earlier, Youngblood filed a Statement of Intent on August 16 indicating Roop would

retain both the vehicles and pay on the associated loans.

52.    Another of the late-filed deficient documents was Roop's Schedules.  *Id.*  Notably

absent from Schedule E/F are Jora Credit and Next Cash, USA, two of the creditors that

automatically withdrew funds from Roop's bank account prepetition.  Roop indicates he

provided the creditors notice of his bankruptcy case after it was filed.

53.    On the afternoon of August 17, the day prior to the meeting of creditors, Roop

texted Youngblood to inquire: "Are we all set for tomorrow[?]"  Youngblood responded the next

morning: "Yes I think so I will call you in about ten minutes."

54.    Youngblood and Roop then had a phone conversation, a couple of hours prior to

the scheduled meeting of creditors, to discuss the meeting.  The phone call lasted less than 20

minutes and consisted of Youngblood telling Roop to answer the trustee's questions with only

"yes" or "no," to avoid providing any explanations, and to try and finish the meeting as quickly as possible.

55.     Roop does not recall whether he provided Youngblood a picture of his driver's license prior to the meeting of creditors.  None of Youngblood's texts or emails request a copy or picture, and none of Roop's texts or emails suggest he provided a copy or picture of his license to Youngblood.  Roop is certain he did not provide Youngblood a copy of, or otherwise show Youngblood, his social security card.  Roop has not had his physical social security card since he was 12 years old.

56.     During the meeting of creditors, when the trustee called the case as being for "James Roop," it became evident, again, the case was filed under the wrong name.  Roop pointed out to the trustee that his name was Jason, not James.[1]

57.     During the meeting, which was held telephonically, the trustee followed COVID-19 Pandemic-related protocols and asked Youngblood to verify Roop's identity.  When asked at the meeting of creditors how he had verified Roop's identity, Youngblood stated "with his Idaho driver's license and his social security card and they do match what's on the petition."

58.     After the meeting of creditors, Youngblood called Roop and indicated he would file something with the Court to correct Roop's name in the filed documents.

59.     On the same day as the meeting of creditors, Youngblood filed a Certificate of Debtor Education, which appeared to indicate Roop had completed a personal financial management course on August 11.  Dkt. No. 18.  No Form 423, Certification About a Financial Management Course was filed with the Certificate.  *See id.*

60.     The meeting of creditors was quickly followed by the chapter 7 trustee's Report

---

[1]  The trustee seemed to think the name had simply been imported incorrectly in his software, and that the mistake was on his end.  The issue, however, was that Youngblood had filed the case with "James Roop" as the debtor.

of No Distribution on August 25, indicating the bankruptcy estate had been fully administered.

61.      When the case had not yet closed by December 1, Roop texted Youngblood asking if he had any update on the case.  Without any response, Roop followed up with another text on December 9 asking if there was any update on when the case was supposed to close. Again, Youngblood did not respond.

62.      On December 16, the Court entered an Order to Show Cause and Notice of Hearing indicating that, while it appeared Roop took the mandatory post-petition financial management course, and while Youngblood filed the Certificate of the course's completion, a required Official Form 423 had not been filed.  *See* Dkt. No. 23.  The Court ordered Youngblood to appear before the Court, via Zoom, on January 3, 2022, to explain his failure to perform his duties under the Code to his client and the Court, to justify his compensation in light of his inactions, and to show cause why the attorney client relationship should not be dissolved, the compensation paid to him reduced or disgorged, or further sanctions or relief imposed under the Court's equitable and inherent powers.  *Id.*

63.      Soon after the Order to Show Cause was entered, Roop filed an Official Form 423 on December 21 *pro se*.  Dkt. No. 26.  That same day, Roop also filed a request for name change to correct the error with his name.  Dkt. No. 27.

64.      The Court entered an Order Discharging Roop on December 23, 2021.  Dkt. No. 29.

65.      Youngblood did not appear at the hearing on the Order to Show Cause on January 3, 2022.  *See* Dkt. No. 32.

66.      On January 12, 2022, the Court entered an Order Terminating Attorney Client Relationship and Deeming Order to Show Cause Satisfied.  Dkt. No. 33.  Among other language,

the January 12 Order provided that, because Roop submitted the missing Form 423 and received

his discharge prior to the January 3 hearing, the case was otherwise ready to close upon

resolution of the Order to Show Cause.  The Court found there was good cause to terminate the

attorney client relationship between Youngblood and Roop, to allow Roop "to freely address any

concerns or issues he may have regarding his case directly with the . . . United States Trustee if

he so desires." *Id.*  While the Court declined taking additional action or imposing additional

sanctions against Youngblood in the January 12 Order, it stated that such was "without prejudice

to other actions if they are shown to be appropriate or required in the future."  *Id.*

67.    Roop has since communicated with the United States Trustee about his case, and

this Motion seeks additional remedies against Youngblood as further identified below.

## II.    REMEDIES UNDER § 329

Section 329(a) requires an attorney representing a debtor in a bankruptcy case to file a

statement of compensation paid or agreed to be paid for legal services in connection with the

bankruptcy case.  Section 329(b) permits the Court to cancel the agreement and order the return

of funds to the extent the compensation exceeds the reasonable value of such services.

Section 329 reflects Congress's recognition that payments by a debtor to his or her

attorney present a "serious potential for overreaching by the debtor's attorney" and that such

payments should therefore be subjected to "careful scrutiny."  H.R. Rep. No. 95-595, at 329

(1977) (reprinted in 1978 U.S.C.C.A.N. 5963,6285).  Bankruptcy courts have broad discretion

under § 329(b) to disallow and require return of attorney compensation found to be excessive.  *In*

*re Columbia Plastics, Inc.*, 251 B.R. 580, 584-85 (Bankr. W.D. Wash. 2000) (citing *In re Fin.*

*Corp. of Am.*, 114 B.R. 221, 224 (9th Cir. BAP 1990)), *aff'd*, 946 F.2d 689 (9th Cir. 2001); *In re*

*Mahendra*, 131 F.3d 750, 757 (8th Cir. 1997).

Apart from standard considerations of reasonableness under factors mentioned in

§ 330(a)(3) (by analogy), courts have found compensation excessive, cancelled compensation

agreements, and denied compensation under § 329 based on attorneys' misconduct or deficient

representation.  As stated by the court in *In re Martin*, 197 B.R. 120, 125 (Bankr. D. Colo. 1996):

> a court's review of the reasonableness of compensation under
> § 329 is a holistic review of the entire attorney/debtor relationship.
> Compensation to a debtor's counsel may be considered excessive
> for a number of reasons including the size of the fee, the nature of
> the services provided, failure to disclose the information required
> by Rule 2016(b), unethical conduct or other causes.

In various cases, courts have determined compensation is excessive and agreements should be

cancelled based on violations of rules of professional conduct, *id.* at 128 (violations of Colorado

Rules of Professional Conduct 1.7, regarding conflicts of interest); and for violations of Local

Bankruptcy Rules, *In re Grimmett*, 2017 WL 2437231 at *11-12 (Bankr. D. Idaho June 5, 2017),

*aff'd*, No. 1:17-cv-00266-EJL (D. Idaho Feb. 16, 2018) ("[T]he value of a lawyer's services to a

debtor is reduced to nothing, or next to nothing, if those efforts include advising the debtor to

violate an order of the Court and a Local Rule.  In this case, under § 329(b), the Court will cancel

the Agreement and order a return of the amounts paid to Counsel by Debtor.").

The cancellation of agreements and the denial of compensation under § 329(b) is also an

appropriate sanction for an attorney's failure to comply with the disclosure obligations of

§ 329(a) and Rule 2016(b).  *See In re Blackburn*, 448 B.R. 28, 40-41 (Bankr. D. Idaho 2011)

(citing *In re Larson*, 04.1 I.B.C.R. 15, 16 (Bankr. D. Idaho 2004) ("[A]ny failure to comply with

[§ 329 and Rule 2016] is given a serious view by the Court, and may subject the attorney to

severe sanctions, including the loss of an attorney's fees earned in a case, disgorgement, or even

monetary sanctions.") (citation omitted)); *see also Turner v. Davis, Gellenwater & Lynch (In re*

*Inv. Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir. 1993); *SE Property Holdings, LLC v. Stewart*

**Motion - 14**

*(In re Stewart),* 970 F.3d 1255, 1267 (10th Cir. 2020) ("That is not to say that full disgorgement

is always appropriate for failure to disclose under § 329.  But it should be the default sanction,

and there must be sound reasons for anything less.").

### III.      REMEDIES UNDER § 526

The Bankruptcy Code defines a "debt relief agency" as "any person who provides any

bankruptcy assistance to an assisted person in return for the payment of money or other valuable

consideration."  § 101(12A).  An "assisted person," in turn, is "any person whose debts consist

primarily of consumer debts and the value of whose nonexempt property is less than $204,425."

§ 101(3).  Youngblood is a debt relief agency in the context of his role as debtors' counsel.  *See*

*also Milavetz, Gallop & Milavetz, P.A. v. United States,* 559 U.S. 229, 232 (2010) (a bankruptcy

attorney falls within the definition of a "debt relief agency").  Roop's Petition indicates his debts

are primarily consumer debts, *see* Dkt. No. 1, and the total value of Roop's property on his

Schedule A/B is $18,427.00, *see* Dkt. No. 15.

If a debt relief agency represents to an assisted person that it will provide certain services

in connection with a bankruptcy case, and then fails to perform those services, the debt relief

agency has violated § 526(a)(1).

A debt relief agency is also prohibited from:

> mak[ing] any statement, or counsel[ing] or advis[ing] any assisted
> person or prospective assisted person to make a statement in a
> document filed in a case or proceeding under this title, that is
> untrue or misleading, or that upon the exercise of reasonable care,
> should have been known by such agency to be untrue or
> misleading.

§ 526(a)(2).

And, a debt relief agency is prohibited from directly or indirectly misrepresenting (a) the

services it will provide to an assisted person or prospective assisted person or (b) the benefits and

risks that may result if such a person becomes a debtor in a bankruptcy case.  § 526(a)(3).

If the Court finds an attorney debt relief agency intentionally violated § 526 or has engaged in a clear and consistent pattern or practice of violating § 526, it may enjoin the violation and impose an appropriate civil penalty against the attorney.  *See* § 526(c)(5).  The Code does not establish an amount or range for determining the amount of a civil penalty.  *See* § 526(c)(5)(B).  Rather, civil penalties should be designed to deter offending parties and others from similar conduct in the future.  *In re Hanawahine*, 577 B.R. 573, 580 (Bankr. D. Haw. 2017)(citing *In re Huffman*, 505 B.R. 726, 766 (Bankr. S.D. Miss. 2014)).  The amount of any civil penalty should be sufficient to serve as a deterrent against future improper conduct, but not be so burdensome as to be punitive.  *In re Huffman*, 505 B.R. at 766.

## IV.    JUSTIFICATION FOR MONETARY AND INJUNCTIVE REMEDIES

There are several problems in this case: Youngblood's failure to obtain and retain wet signatures as required by LBR 5003.1; his unjustified and untimely filing of schedules and other documents in violation of Rule 1007 and LBR 1007.2; violations of various Rules of Professional Conduct; and his failure to perform services he promised would be provided.

### 1.   <u>Violations of Local Bankruptcy Rule 5003.1</u>

Local Bankruptcy Rule 5003.1 requires an attorney to obtain and retain an original handwritten pen and ink signature ("wet signature"); an electronic signature is not sufficient.  *See In re Grimmett*, 2017 WL 2437231 at *11.  The Local Bankruptcy Rule governs electronic case filing, and provides:

> The original of all conventionally signed documents that are electronically filed shall be retained by the filing party for a period of not less than the maximum allowed time to complete any appellate process, or the time the case of which the document is a part, is closed, whichever is later. The document shall be produced upon an order of the court.

LBR 5003.1(e).

Under the Electronic Case Filing Procedures ("ECF PROCEDURES") adopted by the Bankruptcy Court for the District of Idaho, an attorney "Registered Participant filing a Verified Pleading electronically shall insure the electronic version conforms to the original, signed pleading/document."  *See* ECF PROCEDURES at 11 (Bankr. D. Idaho Jan. 16, 2006); General Order No. 394, ELECTRONIC CASE FILING (Bankr. D. Idaho Apr. 9, 2021) (superseding General Order No. 247).

When an attorney submits an electronically signed document to the Court, he is certifying and affirmatively stating to the court that he has the document in his physical possession bearing the original signature of the party.  ECF PROCEDURES at 11; *In re Tran*, 427 B.R. 805, 808 (Bankr. N.D. Cal. 2010).  The history and import of the ECF Procedures and LBR 5003.1(e) were previously addressed by the Court in *In re Daw*:

> Because this Court was in one of the latter waves of the bankruptcy courts nationwide to implement ECF, it could and did draw upon other courts' procedures and practices.  It implemented, by a General Order, the "ECF Procedures" and amended the Local Rules of the Court.  *See* General Order 187 (Nov. 15, 2004); LBR 5003.1.  Local Bankruptcy Rule 5003.1 was adopted and governed electronic filings, and it referred to and incorporated the ECF Procedures.  Among other things, LBR 5003.1 addressed the subject of signatures:
>
> **(j) Signatures.**
> The electronic filing of any document by a Registered Participant shall constitute the signature of that person for all purposes provided in the Federal Rules of Bankruptcy Procedure.  For instructions regarding electronic signatures, refer to the ECF Procedures.
>
> *See also* General Order 187 at 11.
>
> The Procedures, in turn, created a process for the electronic filing of verified pleadings under Fed. R. Bankr. P. 1008.  Under the ECF Procedures, at 13.A:

> A Registered Participant filing a Verified Pleading
> electronically shall insure that the electronic version
> conforms to the original, signed pleading/document.
> Each signature on the original, signed pleading/document
> shall be indicated on the electronically filed Verified
> Pleading with the typed name on the signature line of the
> person purported to have signed the pleading/document.
> The electronic filing of a Verified Pleading ***constitutes a
> representation by the Registered Participant that he or
> she has the original, signed document in his or her
> possession at the time of filing***.  The Registered
> Participant shall retain the Verified Pleading for a period
> of not less than the maximum allowed time to complete
> any appellate process, or the time the case or Adversary
> Proceeding of which the document is a part, is closed,
> whichever is later.  The document shall be produced upon
> an order of the Court.
>
> Thus, the Registered Participant (*i.e.*, the lawyer) must insure that
> the electronic version filed through ECF conforms exactly to the
> written version of the physically signed document (*e.g.*, petition,
> schedule, statement, plan, and any amendments thereto).  By
> electronically filing documents, the Registered Participant
> is representing he or she actually has the original, signed document in
> his or her possession.

*In re Daw*, 2011 WL 231362 at *1-2 (Bankr. D. Idaho Jan. 24, 2011) (bold "(j) Signatures" in

original, other emphasis added).

The import of an attorney electronically filing a signed document without having the

signature page in his possession has also been described by this court as follows: "an attorney's

electronic submission of a document to the Court inaccurately 'purporting to have [a party's]

signature is no different than [the attorney] physically forging [the party's] signature and handing

the [document] over the counter to the clerk.'"  *In re Hurd*, 2010 WL 3190752 at *3 (Bankr. D.

Idaho Aug. 11, 2010) (quoting *In re Wenk*, 296 B.R. 719, 725 (Bankr. E.D. Va. 2002)).

In short, if an attorney does not have the original wet ink signature page of a document in

his possession when he represents to the Court, via electronic filing of the document, that he has

**Motion - 18**

the original in his possession, such is an untrue or misleading statement, and the attorney is

subject to penalties due to violation of §526(a)(2).  At the very least, the attorney's non-

compliance with LBR 5003.1 requires the return of any fees under § 329(b).

While Youngblood had Roop "sign" several documents that were later filed in Roop's

bankruptcy, Youngblood never instructed Roop he needed to sign the documents with a pen and

ink.  Youngblood also never asked Roop to send him any original signature pages.  Due to the

distance between Roop and Youngblood, all of their communication was via phone, text, and

emails.  The two never met.  All of Roop's signatures were electronic signatures completed on

his phone, and all were sent to Youngblood either automatically through the DocuSign system or

via email from Roop.  Roop did not send Youngblood any original, pen and ink signatures; in

part, because he never signed anything in pen and ink.

It appears Youngblood has violated the requirements of § 526(a)(2).  And there appears

to be a clear and consistent pattern or practice by Youngblood of violating § 526(a)(2) by making

untrue or misleading statements throughout Roop's case regarding his possession of original

signature pages.  The imposition of monetary and injunctive remedies under § 526(c)(5),

therefore, appears appropriate.  Remedies, such as the cancelling of fee agreements and the

return of fees, under § 329(b) are also appear appropriate due to non-compliance with LBR

5003.1.  *See In re Grimmett*, 2017 WL 2437231 at *11-12 (finding counsel's failure to comply

with the Court's Local Rule regarding original signatures diminished the value of the services

provided by counsel to a debtor).

## 2.  Untimeliness of Filings and Violations of Bankruptcy Rule 1007

Bankruptcy Rule 1007 governs the filing of Lists, Schedules, Statements, and other

documents with the Court.  Rule 1007(b) identifies what Schedules, Statements, and other

documents are required, and Rule 1007(c) specifies the time limits within which such documents must be filed.  For known assets at the time a debtor files a Chapter 7 petition, a debtor's Schedules and Statement of Financial Affairs "shall be filed with the petition or within 14 days thereafter."  Rule 1007(c).

Rule 1007(c) allows courts to extend the 14-day time limit but "only on motion for cause shown" and with notice to the UST and others.  In Idaho, LBR 1007.2 identifies the specific information a motion for extension of time must include.  Local Bankruptcy Rule 1007.2 also specifies that, unless the Court orders otherwise for cause shown, the time for filing the schedules, statements, and other required documents will not be granted beyond the date set for the § 341(a) meeting of creditors.

Untimely filing of Schedules, Statements, and other documents inconveniences (or makes impossible) a Chapter 7 trustee's completion of his duties in a case and adds unnecessary cost and delay to the case's administration.  Other parties in interest are also prejudiced by unnecessarily shortened review periods for determining whether to file a complaint or motion seeking the denial of discharge is appropriate.  *See* Rule 4004(a).

Debtors are duty-bound to file Schedules, Statements, and other documents.  *See* § 521(a).  Roop relied on, and agreed to compensate, Youngblood to assist him in meeting his duties.

Youngblood had Roop sign the signature pages for his Schedules and Statement of Financial Affairs on July 16.  Roop provided the signed documents to Youngblood via email on July 17.  Despite having the signature pages for the Schedules, Statement of Financial Affairs, and other documents in his possession well before the Rule 1007 deadline, Youngblood did not file those documents until well after the deadline had passed – and without seeking an extension

to the filing deadline. The meeting of creditors was only two days away by the time Youngblood finally got around to filing the required documents.

Youngblood's non-compliance with Rule 1007 and LBR 1007.2, particularly given the fact there does not appear to be any justification for the late filing, demonstrates the value of the services provided by Youngblood is less than the agreed upon $2,210; and cancellation of any fee agreements beyond the services' reasonable value is appropriate under § 329(b).

**3.  Violations of Idaho Rules of Professional Conduct**

Youngblood's violation of certain Idaho Rules of Professional Conduct ("IRPC") indicates the compensation received in the above-captioned cases is not reasonable, the fee agreements between Roop and Youngblood should be cancelled, and any paid fees should be reduced or returned under § 329(b).

*a.  Violations of Rules of Professional Conduct 1.3 and 1.4*

The IRPC are "designed to provide guidance to lawyers and to provide a structure for regulating conduct" as well as to "establish standards of conduct by lawyers." IRPC, Scope. In specific, IRPC 1.3, which establishes the standard for an attorney's diligence, provides:

> A lawyer shall act with reasonable diligence and promptness in representing a client.

As such, an attorney should pursue matters on behalf of his client despite any opposition, obstruction, or personal inconvenience to the lawyer. IRPC 1.3, cmt. 1. Lack of diligence by an attorney can result in adverse consequences for a client, and, at the very least, can cause a client needless anxiety and to question the attorney's trustworthiness. *Id.* at cmt. 3.

IRPC 1.4 establishes standards relating to an attorney's communication and provides:

> (a) A lawyer shall:
> (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in

Rule 1.0(e), is required by these Rules;

(2) reasonably consult with the client about the means by which
the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the
matter;

(4) promptly comply with reasonable requests for information;
including a request for an accounting as required by Rule
1.5(f); and

(5) consult with the client about any relevant limitation on the
lawyer's conduct when the lawyer knows that the client
expects assistance not permitted by the Rules of Professional
Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary
to permit the client to make informed decisions regarding the
representation.

Regular communication by an attorney to his client will minimize the occasions on which the

client needs to request information concerning the representation.  IRPC 1.4, cmt. 4.  If a client

makes a reasonable request for information, IRPC 1.4 requires a prompt response to the request –

either providing the requested information or acknowledging the receipt of the request and

advising the client when a response providing the information can be expected. *Id.*

The communication between Youngblood and Roop shows Youngblood was not

fulfilling his duties of diligence and communication in his representation of Roop, and that

action by the Court is warranted.  From their initial contact, Youngblood expressed to Roop that

he would file his bankruptcy case within days.  Youngblood initially told Roop he "should be

able to file everything Sunday," June 27.  June 27 came, and while Youngblood indicated on the

afternoon of June 27 that he was sitting down to do some work, implying he was going to be

working on Roop's case, no case was filed on June 27.  Youngblood did not inform Roop the

case had not been filed or the reasons why the case was not filed.

The date on the signature pages signed by Roop indicate the Petition was prepared by no

later than June 29, 2021.  *See* Dkt. No. 8.

On morning of July 1, Youngblood texted Roop he was "getting ready to file [Roop's case] now." Again, no case was filed on July 1 and Youngblood did not tell Roop or explain why the case was not filed.

On July 2, Youngblood again indicated he would be filing Roop's case that day, texting Roop in the afternoon "I will send you, your case number date and time we go to court etc here in about a hour or so (sic)." Youngblood had Roop sign the various signature pages that would be necessary to file the case on the morning of July 2. Yet, again, Youngblood did not file Roop's case. He also did not tell Roop the case was not filed or explain why not.

On July 7, Youngblood sent Roop an email that he was "filing [Roop's] case today" and would get Roop a notice of filing to Roop before he left for the day." The case was not filed, and Roop was not notified of or given an explanation for the non-filing.

Finally, Youngblood told Roop he was going to file his case on July 16 and followed through and filed the case that day, nearly a month after Roop's initial outreach to Youngblood.

The result of Youngblood's repeated statements to Roop that he was going to be filing his case, only to then not file the case and not tell Roop the case was not being filed, was that Roop was constantly trying to follow up with Youngblood to find out if the filing happened and if he could get the case number that Youngblood indicated was important to stop payments from being deducted from Roop's bank account. In the meantime, Roop did not have the protection of the automatic stay and creditors continued to withdraw funds from Roop's bank account. $1,403.88 was withdrawn from Roop's account or assessed as overdraft fees as a result of withdrawals between July 2 and July 16.

The repeated delays by Youngblood in filing Roop's case, despite repeated assurances the case was being filed, show a lack of the diligence contemplated in IRPC 1.3. Further

evidence of Youngblood's lack of diligence in Roop's case is seen in Youngblood's failure to

timely file Roop's Schedules, Statements, and other documents until they were weeks overdue

even though Youngblood had the signed documents in hand since the day after the petition date.

Youngblood's lack of communication with Roop about his non-filing of the case, the reasons for

the non-filing, and the late-filing of deficient documents, in spite of Roop's regular requests for

updates regarding the status of the case, demonstrates a lack of compliance with IRPC 1.4.

Even more, the lack of diligence and communication shows the value of Youngblood's

services is less than the agreed upon $2,210 for legal services for all aspects of the case.

### b. *Violations of IRPC 4.1 and 8.4*

An attorney has a duty to be truthful while representing a client.  That duty is outlined in

IRPC 4.1, which provides, in part:

> In the course of representing a client a lawyer shall not knowingly:
>
> > (a)  make a false statement of material fact or law to a third
> > person;

In addition, IRPC 8.4 states:

> It is professional misconduct for a lawyer to:
> > ****
> > (c) engage in conduct involving dishonesty, fraud, deceit or
> > misrepresentation.

The duties of truthfulness and to avoid dishonest and deceitful conduct dovetails with the

§ 526(a)(2) prohibition against making, or advising an assisted person to make, an untrue or

misleading statement in a document filed in a case or proceeding.

As noted elsewhere in this Motion, including in the discussion regarding signature pages,

Youngblood's representations regarding his possession of original wet ink signatures were

untrue and misleading.  Potentially more egregious, however, were his statements at the meeting

of creditors that he had verified Roop's identity with Roop's driver's license and social security card, both of which were documents Youngblood had never seen.

Youngblood also engaged in a practice of repeatedly informing Roop that he was filing Roop's case even though he was not doing so and, at times, did not have the signatures or other information required to do so. Youngblood's repeated promises that Roop's case would be filed on multiple days demonstrates dishonest and deceitful conduct.

The violation of IRPC 4.1 and 8.4 caused by Youngblood's false statements and representations is cause for the cancelling of fee agreements and the return of fees under § 329(b) because it shows the value of the services provided by Youngblood is less than agreed.

### c.  *Additional Violations of IRPC 8.4(d)*

When an attorney has a client sign Schedules and Statements under penalty of perjury, without allowing the client the opportunity to first review the documents, the attorney is engaging in sanctionable conduct under § 329(b) and Rules of Professional Conduct, such as IRPC 8.4(d). Idaho Rule of Professional Conduct 8.4(d) proscribes "conduct that is prejudicial to the administration of justice." Schedules and Statements of Financial Affairs, among others, are to be filed as sworn documents and, if a client's signature is meant to represent the client has previously reviewed the documents and confirms their accuracy, even though the client has never seen the documents, an attorney's procurement of the client's signature on the documents' signature pages is severely prejudicial to the bankruptcy system and the administration of justice.

The bankruptcy system relies on attorneys' honesty and self-regulation to properly function and a practice of having clients blindly sign and return signature pages for documents they have never seen undercuts the proper functioning of the system. *See In re Husain*, 533 B.R. 658, 698-99 (Bankr. N.D. Ill. 2015). Such conduct leads clients to believe that accuracy in

bankruptcy disclosures is optional; jeopardizes potential criminal and civil enforcement actions

that might be warranted against clients; and exposes clients to adverse actions, including attacks

on their bankruptcy discharges due to obtaining discharges fraudulently.  *Id.*

Youngblood had Roop sign multiple signature pages in this case for documents

Youngblood had not first provided to Roop to review.  As a result, Roop signed several

documents under penalty of perjury, indicating he had read the documents and that they were

true and correct when he had never, in fact, read the documents.  Such put Roop at potential risk

of consequences due to the untrue and misleading nature of the signatures and makes

questionable whether any criminal or civil enforcement action relying on Roop's sworn

statements could have successfully been brought against him.

Youngblood's designing of his client's signing process to involve electronically signing

documents' signature pages without first having read and reviewed the documents' contents

warrants the cancelling of Youngblood's fee agreements with Roop and the return of any

collected fees because it further shows there was little to no value in the services Youngblood

provided to Roop.

4. <u>**Youngblood Did Not Render Legal Service For All Aspects of Roop's Bankruptcy
Case**</u>

Youngblood informed Roop he would perform all services necessary to complete and

close Roop's case.  Those representations were made in phone conversations with Roop and in

the 2016(b) Disclosure of Compensation that Youngblood had Roop sign before it was filed by

Youngblood.  *See* Dkt. No. 5.  Youngblood, in the Next Steps Email, also made representations

to Roop that, between the filing of the July 16 Petition and the filing of Roop's deficient

documents, he would call Roop to review the information in the deficient documents.

As to the phone call that was supposed to occur before the deficient documents were filed, it simply never happened.

Regarding rendering legal service for all aspects of Roop's case, despite multiple instances where Roop or others brought to Youngblood's attention that Roop's case was filed with the wrong first name, and though Youngblood told Roop after the 341 meeting that he would correct the error, Youngblood never made the correction. Ultimately, in December 2021, Roop had correct his identity with the Court.

Youngblood never filed an Official Form 423 indicating Roop's compliance with the post-petition financial management course requirements of the Code. Though a notice of required corrective action was on the docket in Roop's case since August 18, 2021, Youngblood never took any action to correct the oversight. Eventually, Youngblood became non-responsive in the case and Roop had to file the Form 423 himself to obtain his discharge.

A few of Roop's creditors are omitted from his Schedules. While Youngblood had Roop verbally list the creditors he could remember over the phone, Youngblood never obtained documentation of creditors' identities, did not review the Scheduled creditors with Roop, and did not provide Roop a copy of the Schedules to review prior to signing them. As such, the creditors' omission from the Schedules was not caught. But for Roop's independently providing the creditors timely notice of his bankruptcy case, Youngblood's omission could have resulted in the creditors' debts being excepted from discharge. *See* § 523(a)(3).

Youngblood's failure to perform service for all aspects of Roop's bankruptcy case is a violation of § 526(a), and remedies pursuant to § 523(c)(5) are appropriate. In addition, the fact that Youngblood did not perform all services required in Roop's case, despite charging Roop a specific amount to "render legal service for all aspects" of Roop's case, indicates the amount of

compensation agreed to be charged exceeds the reasonable value of the services provided. The

agreed compensation amount was in exchange for legal service for all aspects of Roop's case and

Youngblood did not provide legal services for all aspects of the case. As such, remedies under

§ 329(b), including the cancellation of the fee agreements and the return of any collected fees,

are appropriate.

## V.    REQUEST FOR RELIEF

Based on the above, the UST asks the Court to impose appropriate monetary and non-

monetary remedies, including:

- Cancelling or voiding any contract or agreement between the Roop and Youngblood

  under §§ 329.[2]

- Under § 329, ordering the return to Roop the amount of fees he paid to Youngblood.

- Pursuant to § 526(c)(5)(B), as a result of Youngblood's intentional violations, and

  pattern and practice of violating, §§ 526(a)(1), (a)(2), and (a)(3), the Court should

  impose an appropriate civil penalty against Youngblood to deter him from making

  untrue and misleading statements and misrepresentations in the future.

Date: April 1, 2022                    GREGORY M. GARVIN
                                       Acting United States Trustee for Region 18

                                       /s/ Jason R. Naess
                                       JASON R. NAESS
                                       Attorney for Movant Acting United States Trustee
                                       jason.r.naess@usdoj.gov

---

[2] Roop does not have copies of any of the fee agreements between himself and Youngblood. While he has certain text messages and/or emails from Youngblood referencing fee agreements, he does not have copies of the agreements themselves (signed or otherwise). The 2016(b) Disclosure of Compensation filed in Roop's case indicates Roop agreed to pay Youngblood $2,210 for legal services for all aspects of his bankruptcy case. Dkt. No. 5. Fresh Start Funding automatically deducts funds from Roop's bank account, presumably on the basis of a fee agreement between Roop and Youngblood. The UST requests an Order from the Court voiding whatever fee agreements might exist between Roop and Youngblood, or, at least, voiding whatever portion of any such fee agreements the Court deems to be beyond the reasonable value of the services provided by Youngblood.

## <u>CERTIFCATE OF SERVICE</u>

I HEREBY CERTIFY that on April 1, 2022, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

David P. Gardner (Chapter 7 Trustee) trustee@winstoncashatt.com, dpg@winstoncashatt.com; ID17@ecfcbis.com;azh@winstoncashatt.com

US Trustee ustp.region18.bs.ecf@usdoj.gov


AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participants in the manner indicated:

<u>Via first class mail, postage prepaid addressed as follows</u>:

Jason Roop
120 Sherwoods Road
Sagle, ID 83860

Kameron Youngblood
PO Box 50495
Idaho Falls, ID 83405

Fresh Start Funding, LLC
1805 N. Scottsdale Rd, Suite 100
Tempe, AZ 85281

Fresh Start Funding, LLC
c/o Daniel E Garrison, Manager
1840 E Rawhide St.
Gilbert, AZ 85296

<u>Via email to</u>:

youngbloodlaw@gmail.com (the email address Kameron Youngblood provided to (a) the Debtor in the above-captioned case and (b) the Idaho State Bar in connection with his bar membership prior to cancellation of his license on March 7, 2022);

ylocourtnotice@gmail.com, G29963@notify.cincompass.com (the email addresses by which Kameron Youngblood received CM/ECF notice in this case prior to his termination as Debtor's counsel)

Date: April 1, 2022

GREGORY M. GARVIN
Acting United States Trustee for Region 18

/s/ Jason R. Naess
JASON R. NAESS
Attorney for Movant Acting United States Trustee
jason.r.naess@usdoj.gov

Motion - 29